Alton D. Matlock instituted this suit against the International Paper Company seeking to recover compensation for an injury he alleged he received in an accident while performing services for defendant. He alleged the accident arose out of and in the course and scope of his employment. Defendant admits that plaintiff suffered an accident while in defendant's employ, but denies that said accident caused the disability plaintiff claims to exist now. The lower Court rejected plaintiff's demands and he is now prosecuting this appeal.
Plaintiff is a man twenty-seven years of age and had been in the employ of defendant since October 13, 1941, and had lost very little time from work during the entire period. On June 13, 1943, he was working on a small cutter at a wage of 62 cents per hour, eight hours per day and six days per week. Between 9 and 10 o'clock on the morning of this day, plaintiff was engaged in turning out a cutter reel from behind the rewinder. One end of the cutter reel is turned upon a cutting stick and one end is on the floor. The end in the air was ridden by plaintiff and as he came down with the end and when it was about eight inches from the floor, another employee pushed or released another heavy roll of paper, 60 inches in diameter and four or five feet long and which weighed approximately 2000 pounds, and it rolled down striking plaintiff in the back and impinging him between it and the end of the cutter reel he was working on, which was 35 inches in diameter and weighed approximately 1000 pounds. The force of the blow was against plaintiff's lower back and pelvis region. As he described it — he was knocked out a short while and when he came to, one of the rolls had been moved and he was on his knees trying to get up. A fellow employee helped plaintiff up and assisted him to his foreman or operator, who sent him to First Aid and who in turn called a taxicab and sent plaintiff to a sanitarium where he was examined by defendant's doctors. Two of these physicians examined plaintiff, however, only one testified.
After the examination, the doctors gave plaintiff a prescription for some medicine to ease his pain. He then caught his ride home, where he stayed in bed for a period of from four to six days. The diagnosis placed on plaintiff's card by the doctors who examined him was "convulsions of the Spinal and Pelvis". The company doctor testified that when he first saw plaintiff, he had just been injured and was more or less in shock, but was able to get up and *Page 639 
down on the table and that he advised plaintiff to take it easy for a few days and go on back to work. The doctor said plaintiff was hurt all through the pelvis. It is shown by the other witnesses that while plaintiff was in bed at home the next few days, he was blue in the lower abdomen and back.
Plaintiff is a man with a family and had no means of support other than his wages. As he described it, he was hard pressed financially and felt that he had to work, therefore, after from four to six days in bed, plaintiff went to the company doctor and asked to be released for light work and was given such release. While plaintiff was confined to his home, the company doctor made one visit to see him. Plaintiff returned to work and was given the job of cleaning up waste paper and going to the Cafeteria for the "bunch", as he described it. He did this kind of work from about June 17th or 18th until July 4th, at which time plaintiff took his vacation of one week, however, at the end of the week plaintiff was not well enough to go back to work. He was either visiting the doctor or the doctor was visiting him at his home during that time. Plaintiff was trying to get in shape to go back to work. On the 18th of July, he felt better, went back to work and continued to work until August 16th, when his condition was such that he was forced to quit. The last two weeks of this period he worked at his regular job, which is heavy work. One of plaintiff's fellow employees testified that plaintiff worked in pain all the time, and that it was every noticeable that he was suffering.
We relate the above facts to show that plaintiff could not be classed as a malingerer. He wanted to work, tried to work and did work as long as his condition would permit. Finally the pain was so great that it made him sick. After plaintiff was forced to cease working, he asked for compensation and was told he had none coming to him. However, it was suggested that he might collect under a Group Health policy he had taken out through the defendant, and the company's doctor filled out the medical part of the application and assisted plaintiff in filling out his part and under this policy plaintiff collects sick benefits.
Plaintiff has not been able to perform any labor since he quit the company, and there is no evidence to show that he will be able to work any time soon, if ever again. Plaintiff did not make any claim for compensation until his condition became so bad he could no longer work. The best proof that he was not trying to build up a compensation suit is that he used his doctor, the company's doctor, not only until the time he quit work but afterwards and never consulted any other doctor. The record makes certain, we think, that prior to the accident of June 13, 1943, plaintiff was a well, able-bodied man performing every day the hardest kind of manual labor and since the accident has never been well for one day and is now totally disabled to perform any manual labor. It is also certain that he has done all that is in his power to get in condition to perform manual labor, and that he worked as long as it was humanly possible for him to work before asking for compensation.
The only question now for determination is whether or not the accident was the cause of plaintiff's present condition. It is defendant's contention that his present condition was not caused by the accident, but by other causes and their defense is based on the fact that he did perform hard labor for two weeks before he quit and that he claimed insurance for sickness and not because of the accident. Plaintiff contends that the accident caused a fracture of the fifth lumbar vertebra, which has impinged the Sciatic nerve, causing him great pain in his leg. He complains of the leg hurting him ever since the accident and states that when he gets up in the morning, he cannot use the leg until it is massaged with liniment. He claims not to have any more use of it early in the morning than one with the "Jake Leg", and also complains of severe pain in the region of the lower back; that it pains him to stoop or bend his back. Manual labor causes plaintiff severe pain in the leg and back.
One of the doctors who testified for the plaintiff explained why the leg would hurt if the fifth lumbar vertebra were fractured, giving as his reason that the Sciatic nerve leading to the leg passes through that part of the spine. There were five doctors who testified in the case and all agree there is an abnormality in the fifth lumbar vertebra. As is usual, they differ in their testimony, some of them say it is a congenital condition and others that it is clearly a fracture. One of the doctors who thought it congenital, changed his mind when shown an X-ray plate which clearly showed the spinous process present. His testimony that it was congenital was based *Page 640 
solely on the theory there was no spinous process of the fifth lumbar vertebra. The other two doctors, who testified plaintiff's condition was congenital, did not see the picture showing the spinous process. We do not know what their testimony would have been if they had been shown this X-ray plate.
Extracts read into the record from recognized medical authorities show that the condition found in plaintiff's back is almost always caused by trauma. While it is admitted that it is difficult to determine whether such an abnormal condition that exists in plaintiff's back is caused by trauma or is congenital, when one takes into consideration the kind of accident plaintiff was involved in and the results which followed, pain in the back and Sciatic nerve in the leg, it is sufficient, we think, to find that the condition was caused by trauma and was not congenital.
Defendant attempted to show that if there were a fracture of this vertebra, plaintiff could not have performed the labor he did thereafter. On this question the physicians again disagree. Several doctors for the defendant say plaintiff could not have done the work because of pain, without any further discussion. One of the doctors offered by plaintiff explains why one in plaintiff's condition could go on with his work for a while. He was asked if it was unusual for a man with a broken back, such as plaintiff had, to return within a short time and work for a period of several weeks, and he replied, "A. I think it is unusual and I will tell you why, it is conceded that there are more backs broken than they are diagnosed, and because a man don't complain when his back is broken is that the ligaments have no nerve supply nor the bones have no nerve supply around the joint and it is irritation, the growth, the nerve back into the joint, now it is conceded by, it is generally known that a pain will be intermittent in a fractured spine, and it is only when you twist that spine around and it locks the joint that it hurts, and people do work that way and cause a man don't complain of his back being broken why it is no sign that it isn't broken but sooner or later it will hurt him, sometimes it takes six months, if it weren't for that fact that a man could work for six months when he didn't know his back was broken, they would certainly be no such thing as Kummell's Disease."
It is evident plaintiff did not know he had a broken vertebra because his doctor, who was the defendant's doctor, never told him. This doctor contends that it is a congenital condition and not a fracture. Plaintiff was told he would be sore for a while but to go on back to work which he did. We have had numerous cases before us where men worked with broken backs and did not know it until the pain became so severe they could no longer stand it. The fact that plaintiff, who was uninformed of his condition and relied on the doctor who was in defendant's employ, did light work for two weeks before being forced to quit on account of the severity of the pain caused by the labor, does not, to our minds, prove that he did not have a fracture of the fifth lumbar vertebra. We might add that, regardless of whether the fracture was there or not, it is conclusively shown that he was well and able to work prior to being crushed between the two heavy rolls of paper, and since that time has never been well. There is no evidence to show any other cause for his pain and disability. It would be unreasonable to suppose that one crushed between two heavy objects weighing from one to two thousand pounds would not receive some injury and, in this case, where plaintiff has done everything in his power to keep working, wants to work and did work as long as he could bear the pain, it can only be concluded that the accident did cause his disability.
Defendant's other contention that plaintiff applied for and received insurance for sickness not caused by an accident, thereby by his own acts declaring he was not injured in the accident is, to our minds, without merit, under the facts of this case. After plaintiff was told by defendant that he had no compensation coming to him and suggested that he might secure payments under his sick benefits insurance, he secured from defendant the blanks to be filled out by him and his doctor. He took them to his doctor, who was defendant's employee, which doctor filled out the physician's report and assisted plaintiff in filling out the employee's report. The doctor, in answer to the question of "Nature or Cause of Disability", said — "Fissure in Ano and Hemorrhoids", and stated plaintiff had been confined to his house from August 16th to September 9th. August 16th was the day plaintiff was forced to quit work. The doctor stated in this application that *Page 641 
he was first called to see plaintiff on August 16th and also that he thought plaintiff would be able to return to work on October 1, 1943.
Without imputing any motive to the doctor other than to help plaintiff, who seemed to have great confidence in him, it is clear from the evidence in this record that the doctor treated the Insurance Company unfairly, for it has been proven that plaintiff was not and had not been suffering from the conditions given by the doctor as the cause of his disability. The doctor also testified on the trial of the case that he visited plaintiff at his home on July 11th in a professional capacity. Plaintiff filled out the blank required to be filled out by him and copied in the cause of disability as given by the physician, and testified that he did not know what it meant. He also copied the dates given by the doctor as to treatments, etc., and testified he was told his application would have to be the same as the doctor's report.
In answer to Question 9 (a) "Were you at work when the accident happened?" the word "No" appears; and in Question 10 "If you are entitled to benefits for disability from any other source, name the company, society or lodge?" the answer is "None". Plaintiff is very positive that he did not write the words "No" and "None" and that these questions were not answered when he turned the application over to the doctor. He swears it is not his handwriting. The doctor swears he did not write the words "No" or "None", but does not say these questions were answered when he received the application. No one disputes plaintiff's statement that he did not write the two words but, assuming he did, we do not think it would disprove his contention that he was injured in the accident of June 13, 1943.
This young man was in desperate circumstances, was broke and unable to work. Defendant had refused to pay him compensation, he had followed the doctor's advice all the way and continued to follow it in an attempt to secure funds to feed his family. He testified that he was entitled to the insurance payments, regardless of other sources which might be liable to him. The only difference, he thought, there was between this policy and any other insurance policy was that he got it a little cheaper by getting it through defendant. If we could find under the testimony that plaintiff wrote the words "No" and "None", which we cannot find to be a fact, it would only affect the veracity of plaintiff. It is clear to us he applied for the insurance at the suggestion of those in charge of compensation payments for defendant, and he could never have received payment from the Insurance Company had it not been for the help given by defendant's doctor, who erroneously stated the cause of plaintiff's disability.
We are convinced plaintiff has made out his case and is entitled to compensation for total permanent disability. He was earning a weekly wage of $29.76, sixty-five per cent of which is $19.34.
It therefore follows that the judgment of the lower Court is reversed and there is now judgment for plaintiff in the sum of $19.34 per week for a period not to exceed 400 weeks, beginning June 20, 1943, with five per cent per annum interest on each weekly payment from due date until paid, less a credit of 6 1/2 weeks, the period plaintiff worked after the accident and for which he received wages. The expert witness fees of Drs. Mosley and Cannon are fixed at $35 each and taxed as costs; all costs to be paid by defendant.